# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

| In the Matter of the Search of: | )  |  |
| --- | --- | --- |
| 3240 N. Summit Avenue, Milwaukee, WI | ) | Case No. 17M036 |
|  | ) |  |
|  | ) |  |
|  | ) |  |
|  | ) |  |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment E

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment F

The basis for the search under Fed. R. Crim P. 41(c) is:
- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 18, United States Code, Section 1341and 1343

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Allen J. Pettigrew, FBI
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: March 20, 2017

_____
*Judge's signature*

City and State: Milwaukee, Wisconsin

Honorable David E. Jones , U.S. Magistrate Judge
*Printed Name and Title*

## AFFIDAVIT

STATE OF WISCONSIN    )
                       ) ss.
MILWAUKEE COUNTY   )

I, Allen J. Pettigrew, being first duly sworn, hereby depose and state as follows:

1.      I am employed at the Federal Bureau of Investigation (FBI) as a Special Agent. I have been employed in law enforcement since June 2014. I am currently assigned to the Madison Resident Agency of the Milwaukee Division (Madison RA). I am also a Certified Public Accountant (CPA) with several years of accounting experience prior to my employment with the FBI. During new agent training, I received approximately 64 hours of financial investigations training. Since graduating from new agent training, I have received approximately 104 hours of financial investigations training. While employed by the FBI, I have conducted and assisted with investigations of federal criminal violations related to wire fraud and bankruptcy fraud, among other violations. I have also participated in executing search warrants related to wire fraud. As a Special Agent with the FBI, my duties include investigating violations of federal criminal law, including mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343).

2.      I am conducting an investigation of Christopher J. Nohl, Michael Hull, and Patrick Hull, in violation of Title 18, United States Code, Sections 1341 and 1343. I know the facts contained in this affidavit through my personal knowledge, training, and experience, and through information I received from other law enforcement officers, who have provided this information during the course of their official duties and whom I

1

consider to be truthful and reliable. I have also received information from employees of the Securities and Exchange Commission (SEC) whom I believe to be truthful and reliable. During the course of my investigation, I have spoken to and retained as a consultant Shelley Sandler, a gemologist who has worked with the FBI and other government agencies before. Shelley Sandler is an independent appraiser of fine jewelry, precious metals and gemstones and President of S. Sandler, Inc., located in Houston, Texas. After earning a Graduate Gemologist (GG) diploma from the Gemological Institute of America (GIA) in 1987, she started doing insurance, divorce, and estate appraisals, and expanded her practice with local and Federal Government contracts to appraise seized assets. Among other things, Ms. Sandler has advised me regarding the gem, stone, and mineral markets, appraising such items, and the care and handling of such items.

3.      During the course of this investigation, on February 10, 2017, I applied for and obtained issuance of a warrant to search Google's files associated with the account christopherjnohl@gmail.com because I had obtained information from the SEC that the account was used in connection with the purchase of the underlying assets of the investment fund. I have presented some, but not all, of the information obtained from that warrant here where it is relevant to probable cause.

4.      Based upon the information described below, I submit that probable cause exists to believe that Christopher J. Nohl, Michael Hull, and Patrick Hull have committed the crimes of wire and mail fraud, in violation of Title 18, United States Code, Section 1341 and 1343, and that evidence relating to these crimes can be found at 111 E. Kilbourn

2

Avenue, Suite 2800, Milwaukee, WI; 207 E. Buffalo Street, Suites 604 and 605 Milwaukee, WI 53202; and 3240 N. Summit Avenue, Milwaukee, WI, more particularly described in Attachments A, C, and E of this affidavit, for the evidence more particularly described in Attachments B, D, and F.

5.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

<u>**PROBABLE CAUSE**</u>

6.      Based on my investigation, there is probable cause to believe that Nohl and Michael and Patrick Hull have engaged in a scheme to defraud investors by systematically overvaluing assets held by the private investment fund that Nohl and the Hulls manage, in order to increase their management fees and profit allocations from the fund, which are each based on the valuation of assets held by the fund. Nohl and the Hulls represented to potential investors that the fund would invest primarily in distressed housing assets. Instead, they actually invested in purportedly rare gems and minerals whose valuations are more easily manipulated as discussed below. Nohl and the Hulls overvalued the assets by obtaining false or misleading appraisals that did not comply with their representations to investors. This included: (1) Using replacement value appraisals, but representing them as fair market value appraisals; and (2) reporting unrealized gains within the first calendar year of a purchase, but representing to investors that no such gains would be reported until after the first calendar year of a purchase.

3

**The SEC Examination**

7.        In May of 2016, the United States Securities and Exchange Commission

(SEC) in Chicago, Illinois, referred a case against Bluepoint Investment Counsel (BIC) and

Greenpoint Asset Management LLC (GAM) to the FBI in Madison, Wisconsin.  Unless

otherwise noted, the information discussed in this affidavit is based on information and

documents I received from the SEC and telephone conversations on Monday, October 3,

2016, and Wednesday, December 14, 2016, with SEC examiners Jeena Cusiak, Bill Chu,

Kristina Dryer, and Steven Levine.  During the telephone discussions, Ms. Cusiak and her

team of examiners informed me that they had conducted an audit of BIC, an SEC

registered investment advisor, and GAM, an investment fund manager, in early 2016.

During that audit, BIC provided each of the documents discussed herein to the SEC

responsive to requests related to, among other inquiries, the operation of certain funds

created and managed by GAM.  Ms. Dryer reported to me that BIC had shared the

documents with the SEC via secure file transfer protocol transfers from January 27, 2016,

through September 23, 2016.  These document transfers were arranged by Michael Hull of

BIC and were sent by Lauren Kelly (Kelly), using the email address

lauren.kelly@bluepointinvest.com.

8.        During our October 3 discussion, the SEC examiners identified the BIC and

GAM affiliated Greenpoint Tactical Income Fund (the Fund) as having utilized suspicious

valuation practices for its assets, which the Fund has described as rare gems and minerals.

9.        The examination findings provided to the FBI by the SEC examiners

4

identified many irregularities that led examiners to become suspicious of the Fund's accounting practices. These suspicious practices include significant unrealized gains claimed as profit and incentive fees allocated to the Fund's managing members, appraisals with insufficient detail regarding value inputs, promotional or sales literature-style appraisals, the use of replacement value appraisals instead of fair value appraisals, and insurance that is insufficient to cover the reported fair values of the gems and minerals.

10. The SEC routinely conducts examinations of SEC-registered companies, and, as a result, would have significant experience in identifying suspicious investment practices. Therefore, the SEC's suspicions contribute to a finding that probable cause exists to believe evidence of fraud will be found at the proposed search locations.

### The Fund's Structure, Management, and Purpose

11. The SEC examiners provided me with the Fund's "2015 Financial Statements Including Independent Auditors' Report" (the 2015 Report), dated July 29, 2016, which the Fund made available to investors.[1] The 2015 Report indicates that the Fund is managed by two entities: Chrysalis Financial LLC (Chrysalis) and Greenpoint Asset Management II (GAM II). Chrysalis is owned by Chrysalis Holding Company (Chrysalis Holding) and was founded in 2009 by Christopher Nohl and Dr. Shannon Graewin, according to my

---

[1] Under the section 10.5 of the Fund's operating agreements, GAM II and Chrysalis are required to send each investor "statements of income, Members' equity, changes in financial position, and a cash flow statement for the Fiscal Year then ended." Section 10.3 of the operating agreements provides investors the right to inspect and copy at any time "the Company's federal, state, and local income tax returns and financial statements, if any, for its four most recent years."

5

review of the Chrysalis website. According to records that I received from the Wisconsin Department of Financial Institutions (WDFI), Graewin is the registered agent for Chrysalis Holding. According to its website, Chrysalis describes itself as a financial services company that manages private equity funds among other services. In disclosures made in a 2013 offering memorandum, investors were informed that Patrick Hull is president of GAM II, which is wholly owned by GAM, which is in turn wholly owned by Patrick Hull and his brother Michael Hull. BIC is also a Michael and Patrick Hull-owned entity. According to the Investment Adviser Public Disclosure form available on the SEC's website, BIC has been an SEC registered Investment Adviser Firm since January 11, 2012. BIC serves as the investment manager for affiliated private investment funds, including the Fund. According to the Fund's Operating Agreement, BIC also serves as the registered agent for the Fund.

12. I have reviewed the Fund's two offering memoranda that BIC provided to the SEC. The Fund is a Wisconsin limited liability company that operates as a private investment fund, according to the memoranda. As described in these memoranda, to raise investment capital, the Fund offers membership interests to accredited investors through private placements. The SEC defines accredited investors as, "[a]ny natural person whose individual net worth, or joint net worth with that person's spouse, exceeds $1,000,000." See 17 C.F.R. § 230.501(a)(15).[2] According to the Fund's memoranda, investor

---

[2] Certain entities and corporate officers of issuers are also defined as accredited investors; however, the investors to the Fund appear to be accredited on the basis of net worth.

## AFFIDAVIT

STATE OF WISCONSIN    )
                           ) ss.
MILWAUKEE COUNTY   )

       I, Allen J. Pettigrew, being first duly sworn, hereby depose and state as follows:

1.      I am employed at the Federal Bureau of Investigation (FBI) as a Special Agent. I have been employed in law enforcement since June 2014. I am currently assigned to the Madison Resident Agency of the Milwaukee Division (Madison RA). I am also a Certified Public Accountant (CPA) with several years of accounting experience prior to my employment with the FBI. During new agent training, I received approximately 64 hours of financial investigations training. Since graduating from new agent training, I have received approximately 104 hours of financial investigations training. While employed by the FBI, I have conducted and assisted with investigations of federal criminal violations related to wire fraud and bankruptcy fraud, among other violations. I have also participated in executing search warrants related to wire fraud. As a Special Agent with the FBI, my duties include investigating violations of federal criminal law, including mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343).

2.      I am conducting an investigation of Christopher J. Nohl, Michael Hull, and Patrick Hull, in violation of Title 18, United States Code, Sections 1341 and 1343. I know the facts contained in this affidavit through my personal knowledge, training, and experience, and through information I received from other law enforcement officers, who have provided this information during the course of their official duties and whom I

1

contributions are used primarily to acquire investments in (1) distressed real estate assets; (2) mining, minerals, and precious stones; and (3) intellectual property. The Fund advised investors that it sought to "leverage[] its managers' extensive personal relationships in the banking community to gain access to information regarding distressed asset purchase opportunities." The Fund also informed investors in its 2013 offering memorandum that it would "explore any investment opportunity which has potential to create return on investment, including, without limitation, commercial and multi-family real estate, gems and precious metals."

13.     According to the Fund's "Operating Agreement" and "Amended and Restated Operating Agreement," which were attached to the offering memoranda sent to investors, each managing member is assigned specific areas of responsibility for the Fund. Nohl's Chrysalis is responsible for strategy implementation, identifying properties and assets for purchase, negotiating transactions, ensuring accurate reporting, cash flow management, and leverage management. Based on my investigation, I understand that Chrysalis's Chief Financial Officer, Pamela Kirchen (Kirchen), helped BIC to respond to the SEC's information and document requests. I have reviewed several email exchanges, involving the email account pamelakirchen@chrysalisfinancial.com, in which Nohl, Kirchen, and Kelly discussed the details of responses to the SEC's requests.

14.     The Hull brothers' GAM II is responsible for raising capital, investor relations, evaluating acquisitions and divestitures, managing risk, regulatory oversight, and performance reporting. Through BIC, the Hull brothers recruited accredited investors

7

and placed them into membership interests in the Fund. The minimum purchase of a membership interest in the Fund for new investors is $250,000.

15.     According to its operating agreements and the 2015 Report, the Fund primarily invests through wholly owned limited liability companies, which hold investments in areas such as gems, fine minerals, and other assets. One of these companies is GP Rare Earth LLC, the Fund's holding company for purchases of gem and mineral assets.

16.     On the following page, I have illustrated the relationships between the entities affiliated with the Fund.



17.     In my experience as a fraud investigator and CPA, funds similar to the Fund generally communicate with investors regarding the nature and value of the fund using the United States Mails and interstate wire communications.  Google is a provider of interstate wire communications.

### Profit and Loss Allocation for the Fund Based on Fair Value Appraisals

18.     According to the Operating Agreement and Amended and Restated Operating Agreement of the Fund, the Fund's profits for each calendar quarter are allocated among members based on their Class Unit ownership.  Membership interests in the Fund are divided into two unit types:  Class A Units and Class B Units.  Through private offerings, the Fund sold Class A Units to accredited investors for $25,000 per unit. All Class B Units are owned by Chrysalis and GAM II, under the terms of the Fund's operating agreements.  The agreements provide that Class B Units will always constitute thirty percent of outstanding units of the Fund; as additional Class A Units are issued, the managing members receive additional Class B Units to maintain this 30% percentage ownership of the Fund.

19.     In addition to profit distributions, under the operating agreements, Chrysalis and GAM II each receive a fee equal to one percent of assets under management on a quarterly basis as a management fee. [3] The value of the assets under management is determined on an annual basis.  According to the 2015 Report, the value of the Fund is

---

[3] The managing members are also permitted to receive reimbursement for out of pocket expenses.

10

determined on the bases of "[r]ealized gains and losses on the sale of investments are calculated based upon the difference between the total sales proceeds and the cost basis." The Fund's value also includes unrealized gains, which are "[c]hanges in the fair value of investments [based on] net change in unrealized appreciation (depreciation) on investments."

20.     The first Offering Memorandum and Operating Agreement, effective between April 11, 2013 and November 7, 2013, provided for profits to Class A Units of up to eight percent of each investor's capital contribution and prior year-end account value. Under the Operating Agreement, profits of the fund include both realized sales and unrealized fair market values of assets—net of the assets' cost bases and operational expenses. The Operating Agreement further defined Fair Market Value to include the limitation that "the value of any assets [sic] shall be its purchase price for the year within which it is acquired." Any additional profits above eight percent of Class A capital contributions would then be divided pro rata according to Class A and Class B ownership (70% to Class A and 30% to Class B).

21.     The second Offering Memorandum and Amended and Restated Operating Agreement, effective between November 7, 2013, and the present, provide a more lucrative profit structure for the managing members, Chrysalis and GAM II. The Amended and Restated Operating Agreement includes an identical definition of profits and limitation on asset values for its first year of acquisition as the original Operating Agreement. It also provides that initial profits would be distributed to Class A Unit

11

owners in proportion to their Class A Units owned up to eight percent of each investor's capital contribution or prior year-end account value. If the profits for the quarter exceed eight percent of Class A Unit contributions, Class B Unit owners (Chrysalis and GAM II) receive a distribution of 30% of the profits earned in the quarter. This additional 30% of profits makes the Amended and Restated Operating Agreement more lucrative for Class B Unit owners than the original Operating Agreement. Finally, any remaining profits recognized in the quarter will be distributed pro rata to all Class A Unit and Class B Unit owners according to their percentage interests (70% to Class A and 30% to Class B).

22.     This profit distribution scheme led to large allocations for the managers, Chrysalis and GAM II. In the first quarter of 2014, the Fund reported $6,049,435.42 in profits, and Chrysalis and GAM II allocated themselves 30.59% or $1,850,474.32 and an additional $52,682.60 in management fees. In the second quarter of 2014, the Fund reported $2,264,501.93 in profits, and Chrysalis and GAM II allocated themselves 32.14% or $727,797.66 and an additional $73,351.06 in management fees. In the fourth quarter of 2014, the Fund reported $3,637,323.52 in profits, and Chrysalis and GAM II allocated themselves 33.02% or $1,201,184.64 and an additional $121,546.80 in management fees. In the first quarter of 2015, the Fund reported $18,025,142.01 and Chrysalis and GAM II allocated themselves 32.39% or $5,837,620.22 and an additional $288,678.17 in management fees. Chrysalis and GAM II based each of these reported profits wholly or in large part on unrealized gains.

12

**Creating Unrealized Gains Based on Misstatements and Improper Appraisals**

23.     Between the Fund's inception in early 2014 to December 31, 2015, Chrysalis and GAM II removed in cash over $5.85 million from the Fund, according to the 2015 Report. Specifically, Chrysalis and GAM II have received $4.39 million in cash distributions, and an additional $1.46 million in cash management fees. The vast majority of the cash paid to Chrysalis and GAM II came directly from the approximately $40 million in investor contributions. Accordingly, by December 31, 2015, a minimum of 15% of every investor dollar had been transferred to Chrysalis and GAM II because the Fund has realized gains of only $310,035 in cash from actual sales of investments between its inception and December 31, 2015.[4] During that period, the Fund reported over $43.1 million in unrealized, paper gains, largely on the basis of appraisals. According to the 2015 Report, by December 31, 2015, Chrysalis and GAM II had allocated over $6.5 million in additional funds to themselves on paper, which will allow them to withdraw even more cash from the Fund without realizing any gains for investors. Based on the 2015 Report, the Fund reported these distributions and allocations almost entirely on the basis of appraisals Nohl solicited for gems and minerals.

24.     In the 2015 Report, the Fund represented itself to investors as an investment

---

[4] The Fund reported that it had $563,785 in professional and other expenses. Chrysalis and GAM II have also reportedly contributed $306,033 in cash, however, this appears to have been cash allocations taken from investor contributions based on the Fund's unrealized gains. Approximately $1.4 million in cash has been withdrawn as distributions to the investors.

13

fund that complies with the specialized accounting and reporting requirements for investment companies in accordance with Accounting Standards Codification (ASC) 946. In addition, the Fund's 2015 Report represented to investors that it prepares its financial statements in accordance with United States generally accepted accounting principles (US GAAP). ASC is a component of US GAAP, and is maintained by the Financial Accounting Standards Board (FASB).[5] The Fund also represented to investors that it would record its investments at fair value as of the reporting date.

25.     According to the FASB's ASC 820, "[f]air value is defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." ASC 820 further states, "[t]he determination of fair value should be based on assumptions that market participants would make in pricing the particular asset or liability, which includes the assumption that market participants are acting in their own best interests." ASC 820 defines market participants as "buyers and sellers that are: independent of the reporting entity (i.e., they are not related parties); knowledgeable, having a reasonable understanding of the asset or liability and the transaction based on all available information, including information obtained through usual and customary due diligence efforts; willing to enter into the transaction (i.e., they are motivated but not forced or otherwise compelled to do so); able to execute the transaction." The operating agreements also represented to investors that

---

[5] The FASB is recognized by the Securities and Exchange Commission as the designated accounting standard setter for public companies.

14

the Fund's asset values would be determined based on fair market value.[6]

26.    According to both offering memoranda, the Fund's "goal is to achieve a high level of current income through purchases of distressed real estate notes and other assets of a distressed nature." Based on my review of the 2015 Report, however, the majority of the investment dollars received by the Fund have been used to purchase gems and fine minerals through GP Rare Earth LLC, the Fund's holding company for gem and mineral investments. In fact, the first Operating Agreement provided that distressed assets would "comprise 80% of fund assets," and gems and minerals would "represent up to 15% of fund assets." The restriction on the Fund's investment in gems and minerals was deleted when the Fund amended and restated the Operating Agreement in November 2013. The second Offering Memorandum, however, retained its emphasis on investments in distressed real estate assets, rather than investment in gems and minerals.

27.    According to the 2015 Report, as of December 31, 2015, the total costs of minerals and gems owned by GP Rare Earth LLC were reported as $18,074,041 and $1,624,590, respectively. The total fair values reported to investors in the 2015 Report for the minerals and gems were $54,736,253 and $7,000,595, respectively. In less than three years of operation, the reported valuation of GP Rare Earth's minerals and gems increased

---

[6] The Internal Revenue Service defines fair market value as "the price that property would sell for on the open market. It is the price that would be agreed on between a willing buyer and a willing seller, with neither being required to act, and both having reasonable knowledge of the relevant facts." Although the terms fair value and fair market value are defined slightly differently under US GAAP and IRS rules, the terms appear to have been used interchangeably by the Fund.

15

by 313% and nearly all of this gain has been unrealized. Notwithstanding the Fund's representation to its investors that its principle investment strategy was the buying of distressed assets, the total reported fair value of the minerals and gems accounted for approximately 78.2% of member capital based on the fair value reporting.

28.     According to the 2015 Report, in order to report these increased fair values of its gems and minerals—and therefore unrealized gains—GP Rare Earth has enlisted the services of appraisers. Three of the appraisers GP Rare Earth has used for appraisals are Midwest Gem Lab, James Zigras (Zigras), and William Metropolis (Metropolis).

29.     To analyze the appraisals utilized by the Fund to report fair values to investors, I reviewed the Fund's "investments purchases and sales journal for the period from Inception to December 31, 2015" (the Journal) that was provided to the SEC by BIC. The Journal records information related to each asset held by the Fund, including seller, purchase date, purchase price, appraiser, appraisal date, appraisal value, and any information related to the sale of assets, if applicable. I also reviewed over thirty appraisal reports for assets that the SEC selected during its examination. Some of these appraisals purport to be based on replacement value, while others did not state a valuation type. However, the Fund and GP Rare Earth misrepresented to investors in the 2015 Report that these valuations were based on fair value appraisals of their gems and minerals and relied on them to·claim millions of dollars in unrealized gains.

30.     The five Midwest Gem Lab appraisals sampled purport to have been appraised by Ambika Sharma Dziak (Dziak), Midwest Gem Lab Appraiser/Gemologist.

Based on my review of a LinkedIn internet profile associated with Dziak, she was a gemologist for approximately one and a half years and is no longer working in the business. According to these five appraisals completed by Dziak, the purpose of each appraisal was to determine replacement value,[7] and the function of each appraisal was for insurance. However, as previously noted, the Fund's financial statements represented to investors that the fund used only fair value appraisals to recognize unrealized gains. The Fund relied on these appraisals alone to take unrealized gains of over $5 million. Replacement value and fair value are different methods of valuation. Replacement value is the cost to replace an asset at its pre-loss condition, and takes into consideration the original asset's wear and defects. In general, the purpose of replacement value is to determine the cost of replacing the original asset with an exact duplicate. These appraisal reports do not mention fair value. Fair value, as previously mentioned, is the price a willing buyer and a willing seller will agree to during the sale of an asset in the current market. Therefore, an asset's replacement value may not be identical to its fair value. In general, an asset's fair value will be priced somewhere between its initial purchase cost and its replacement value. In addition, Midwest Gem Lab's website specifically lists appraisal services for fair values, but, based on these appraisals, GP Rare Earth did not

_____

[7] According to Midwest Gem Lab's website, a replacement value appraisal is based on "current market pricing for; creative design, gemstones, labor, materials, and precious metals, along with comparable sales data from local and national retail jewelry stores based in regional shopping malls. The regional shopping mall jewelry store is the marketplace in which the Replacement Value appraisal is based."

17

utilize these services. The representation of the replacement values as the fair values could be significantly misleading.

31.     The five appraisals completed by Dziak, dated March 31, 2015, claimed a total appraised value of $6,340,730. Based on the invoice dated October 2, 2013, and the Journal, the cost of the items totaled approximately $1,260,000, which included $60,000 in commissions to the seller. Based on the appraisal value and original cost, these items appreciated by approximately 403.2% within about one and a half years.

32.     Seven of the SEC-sampled appraisals were purported to be completed by James S. Zigras, LLC, 171 Arundel Rd, Paramus, NJ 07652.[8] Each appraisal identified the client as the Fund and Nohl, and the appraisal type as a "Fair Market Value Appraisal Report." Zigras's appraisals include sections regarding his certifications and qualifications, the type of appraisal and its objectives, report disclaimers, the item's description and characteristics, and the fair market value of the item. None of these seven appraisals bears a signature, and all of these appraisals are dated April 12, 2015.

33.     Zigras's appraisals each indicate that "[t]he reported analysis, opinions, and conclusions are [his] personal, impartial, and unbiased professional analysis, opinions, and conclusions." Notwithstanding this representation of unbiased impartiality, my review of the Fund's Journal of asset purchases and appraisals reflect that just days before

---

[8] A Zigras appraisal for the "Medina: Aquamarine," SKU FSCOBRAQ416140897, which increased the fair value of the asset to $3.5 million from $2.5 million, is reported in the Fund's Journal as having been performed on April 9, 2015 by "Metropolis," however, the appraisal report provided to the SEC is on Zigras' letterhead and is dated April 12, 2015.

18

the seven Zigras appraisals are dated, the Fund purchased $250,000 in minerals from
Zigras. I also note that Zigras' appraisals and purchases were listed in the Fund's Journal
under different versions of his name, causing them to be sorted alphabetically in separate
locations, perhaps to conceal the appearance of a conflict of interests. With respect to
appraisals, the Fund identified him as "J. Zigras," and with respect to purchases, the Fund
identified him as "Zigras, James."

34. The Fund used several of Zigras's appraisals to report unrealized gains in
the same calendar year of the asset's purchase in violation of the Amended and Restated
Operating Agreement, thus misrepresenting the Fund's profits to investors. Reporting an
appraisal as the fair value of an asset in the same calendar year as the purchase of that
asset violates the Fund's operating agreements, which, as noted above, prohibit
revaluation of assets during the year of purchase. In the following spreadsheet, I have
summarized the five Zigras appraisals I have reviewed that violate the operating
agreements:

| Asset | SKU | Purchase Date | Purch. Price | Appraisal Date | Appr. Price | Gain | Percent |
|---|---|---|---|---|---|---|---|
| Tourmaline var. Elbaite "Paderneira Candelabra" | FSCOBRTO211150003 | 11-Feb-15 | $675,000 | 12-Apr-15 | $4,000,000 | $3,325,000 | 492.59% |
| Azurite "Legendary Night" | FSCOMXAZ203150001 | 18-Feb-15 | $2,800,000 | 12-Apr-15 | $7,000,000 | $4,200,000 | 110.53% |
| Tourmaline var. Elbaite "Paderneira Candelabra" | FSCOBRTO203150003 | 18-Feb-15 | $1,500,000 | 12-Apr-15 | $3,500,000 | $2,000,000 | 133.33% |
| Tourmaline var. Elbaite "Paderneira Candelabra" | FSNOBRTO226150006 | 1-Feb-15 | $311,450 | 12-Apr-15 | $750,000 | $438,550 | 140.81% |
| Beryl var. Emerald "The Emperor" | FSCOCOEM203150002 | 18-Feb-15 | $2,500,000 | 12-Apr-15 | $3,500,000 | $1,000,000 | 40.00% |
| Totals | | | $7,786,450 | | $18,750,000 | $10,963,550 | 140.80% |

35. The Fund relied on the five Zigras appraisals to improperly recognize
unrealized gains of nearly $11 million in less than three months, which is a 140.8%
increase in value over the purchase price. According to my review of the 2015 Report, the
Fund included each of these improper unrealized gains in the Fund's aggregate unrealized

19

gain that it reported to investors based on the fair value of the Fund.

36.     Twenty-one of the sampled appraisals purport to be completed by William Metropolis, Mineralogist and Appraiser, 29 Lynnbrook Rd, Lynnfield, MA 01940. Several of Metropolis's appraisals provided a description of the item and an amount, but did not specify the valuation type for the amount. Metropolis's name was associated with two types of appraisals for the Fund. The first type of appraisal is similar to promotional or sales literature. For example, in an appraisal for GP Rare Earth stock keeping unit (SKU) FSCOAFTO304140001 dated September 24, 2014, Metropolis stated, "[n]ot only is this an incredible specimen for the serious collector, it could also be used in a museum setting for teaching the visitor on how minerals form." In another example, while describing a piece of Tanzanite identified as SKU FSNOTZTA930140001, the appraisal stated "[t]his piece is superb in every way and is reputed to be one of the finest ever found. It is also a trichroic viewed as blue, purple and red down the C-axis. With proper lighting this would make for one of the most beautiful exhibit specimens ever found!" In addition, these appraisals do not identify whom the reports are for or the inputs used for valuation, and Metropolis did not sign any of these appraisals.

37.     The second type of appraisal associated with Metropolis consists solely of the identification of the mineral, a date, and an appraised dollar value. Several of these documents purport to be updated appraisal reports by Metropolis, as some of them identify a previously appraised amount. Metropolis purportedly signed each of these appraisals, but again did not specify the valuation type for the amount, valuation inputs,

20

or for whom the appraisal was written.

38.     In addition, according to the Fund's Journal and the 2015 Report, several of Metropolis's appraisals were also used to report unrealized gains to investors in the same calendar year as the asset purchase, in violation of the operating agreements.  For example, Metropolis purportedly appraised "Pederneira Smokestacks Tourmalines," SKU FSNOBRTO208150001, for $750,000 on April 9, 2015, which was reported to investors as a 971.4% ($680,000) unrealized gain on the purchase price dated February 8, 2015.  An April 9, 2015 Metropolis appraisal for "No-Pocket Pocket Tourmaline," SKU FSNOBRTO226150007, was reported to investors as a 114.1% ($159,847.50) unrealized gain on the purchase price dated February 1, 2015.  According to my review of the 2015 Report, the Fund included each of these improper unrealized gains in its aggregate unrealized gain that it reported to investors based on the fair value of the Fund.

39.     I received documents from Jewelers Mutual Insurance Company (Jewelers), which provides insurance coverage for the gems and minerals held by GP Rare Earth.  I reviewed a document captioned Underwriting Authority Notes, dated December 17, 2015, written by Jewelers underwriter Jeff Vandenberg.  Vandenberg reported that Jewelers agent Julie Jones had contacted Bill Tumler, the former CFO of GP Rare Earth, who told her that he is no longer with the company "due to unethical and possible illegal activities." Jones also noted that Tumler had stated, "new inventory was inflated and may be a set up for a claim or misleading investors."  Vandenberg further noted that Pam Kirchen, of Chrysalis, informed Jewelers that "[r]egretfully, Bill had long-term family commitments

21

that conflicted with his work demands. Thus, we parted ways." I also reviewed a December 17, 2015 email obtained from Google in which Nohl supplied Kirchen with the same explanation that, "[r]egretfully, Bill had long-term family commitments that conflicted with his work demands. Thus, we parted ways."

40.    I reviewed an email exchange between Nohl and Metropolis dated July 3-4, 2015, which was months after the date of each of the above-discussed Metropolis appraisals. In that exchange, Nohl asked Metropolis to appraise four items based solely on "pics and videos." Metropolis responded, "[a]lso please give an idea of what you might need for numbers." This exchange suggests that Metropolis was seeking inappropriate and biased input into the valuations of his appraisals, rendering them not fair value appraisals as was misrepresented to the Fund's investors.

41.    I spoke to Ms. Sandler on March 14, 2017, regarding the above and other gem and mineral transactions of the Fund described in the Journal. She described the valuations as "extraordinary." She said that under these Fund's circumstances, and over the period from 2013 to 2015, she would not expect to see increases in value of this size, particularly over such a short period. Furthermore, in the rare gem and mineral market, she does not expect to see vendors sell as such a discount. She noted however, that she could not determine properly appraised valuations of these gems and minerals without physically analyzing them.

42.    The Fund incorporated value of all of the appraisals reviewed into the valuation of its asset values, and the Fund used this value to calculate the management fee

22

and profits as unrealized gains. According to the Fund's 2015 Report, between its inception and December 31, 2015, it accounted for only $310,035 in net realized gain on sale of investments. During the same period, the Fund reported approximately $43,179,994 in net unrealized gain on investments. Approximately $38 million of this unrealized gain was associated with GP Rare Earth.

43.     Because of the large value of reported unrealized gains based on these appraisals, the Fund's managing members have taken significant fees and profit distributions. According to the Fund's 2015 Report, by December 31, 2015, the Fund's managing members, Nohl's Chrysalis and the Hull brothers' GAM II, had received approximately $4,971,205 in distributions from the Fund out of their approximately $11,335,181 in accumulated income. These distributions do not include the managing members' management fees. Because the Fund had realized only $310,035 in gains on investments and received only $167,459 in total investment income, much of these profits were taken directly from investor contributions.

44.     As previously discussed, all of the fees and profit distributions due to the Fund's managing members are based on a percentage of the Fund's total asset value. Therefore, the higher the appraised values of the gems and minerals, the more fees and profit distributions the managing members are entitled to. This provides a significant incentive to inflate the values through false or fraudulent statements. In addition, the valuation of the gems and minerals was based on the discrete attributes of the given asset and thus little, if any, market activity data is used to inform the valuation. As a result,

23

these valuations can be easier to manipulate, and are more difficult to challenge than a market-based valuation. By materially inflating the values reported to investors, Nohl and his partners were able to take for themselves significant amounts of investor contributions.

45.     The following graph illustrates how the cash contributed to or earned by the Fund has been distributed based in large part on the unrealized gains recognized by appraisals. Chrysalis and GAM II, owners of the Class B Units, have distributed to themselves $6.79 million or 17% of all the dollars contributed to the fund and the small interest income ($167,459) and real gains ($310,035).



*The values displayed in this chart are as provided in the 2015 Report.

24

46.     As further evidence of the fraudulent scheme, the reported unrealized gains on the gems and minerals held by GP Rare Earth are entirely uninsured. The insurance coverage documentation of the Fund provided to the SEC reflects an amount of coverage that is significantly less than the value the Fund reported to investors. Moreover, the amount of coverage appears to be significantly less than the purchase price the Fund paid for the gems and minerals. The policy, number 55-010341, is a Jewelers Block Pak provided by Jewelers. As of the effective date, which was November 18, 2015, the policy appears to cover items stored at the Insured Location up to $11,346,000, with a $25,000 deductible. The policy also covers items when they are away from the Insured Location, including up to $10,000,000, with a $25,000 deductible, for items held away from the Insured Location in a safe or vault of a bank, trust, or safe-deposit company. According to the Fund's Schedule of Investments included in its 2015 Report, as of December 31, 2015, the Fund reported approximately $18,074,041 and $1,624,590 in actual costs of minerals and gems, respectively. The 2015 Report also reported the fair value of these minerals and gems as approximately $54,736,253 and $7,000,595, respectively. Other than this policy, the Fund informed the SEC that it held no other insurance for these assets. Based on the insurance documents provided to the SEC, the cost of the minerals and gems is underinsured by approximately $8,352,631, and the reported fair value of the minerals and gems is underinsured by over $50 million.

25

**Probable Cause that Evidence of the Crime will be Located at the Proposed Search Locations**

*Chrysalis and GP Rare Earth - 207 E Buffalo Street*

47.     My investigation has determined there is probable cause to believe Chrysalis and GP Rare Earth occupy suites 604 and 605 of the Robert Marshall Building, which is located at 207 E. Buffalo Street, Milwaukee, WI (the Marshall Building). In addition, there is probable cause to believe the Fund's gems, minerals, and stones are stored at a vault occupied by GP Rare Earth in Suite 605.

48.     Chrysalis employs Chadwick Keller (Keller) to assist in its management of the Fund. I have reviewed many email messages between Keller and Nohl regarding the Fund, Chrysalis, and related topics. Keller's messages were sent from the email addresses chadwickjkeller@chrysalisfinancial.com and chadwickjkeller@gmail.com. For instance, in a July 5, 2016 email exchange, Nohl asks Keller, "[b]ecause of the inclusion of the sold stone in the 2016 appraisals we are going to throw out all Midwest Gemological Appraisals for 2016 – please contact these guys and get an appointment for appraising all cut other than those already appraised by Zigras – give me a cost estimate and a time frame for turn around also please[,]" and Keller responded, "Will do." In an August 22, 2016 email, Nohl sent to Keller an attachment named "GTIF Valuation Guidelines December 2016 Printed.pdf," which is a document on Greenpoint Tactical Income Fund Letterhead that discusses valuation techniques for private equity funds. In a December 7, 2015 email exchange, Nohl instructed Keller at his chadwickjkeller@gmail.com to pay an

26

invoice to "Collector's Edge" for $1700 for laboratory specimen cleaning. Keller's signature lines for both the gmail.com and chrysalisfinancial.com email accounts often bear the title Chief of Banking Operations for Chrysalis.

49.     On March 8, 2017, Postal Inspector Williams spoke with Postal Letter Carrier G. Mack. Mack is the regular letter carrier for the Marshall Building and is familiar with suites 604 and 605. Mack slides mail under the doors of suite 604 and 605, but parcels are delivered to suite 605. Inspector Williams displayed photographs of Nohl and Keller to Mack. Mack identified Nohl as the occupant of suite 605, and Keller as the occupant of suite 604. Mack also informed Inspector Williams he has seen Nohl and Keller together.

50.     That same day, Inspector Williams observed the covers of several items of mail to be delivered to 207 E Buffalo Street, Suite 604, Milwaukee, WI. The recipients of the mail included Nohl, Keller, and Chrysalis. The return address for one of the mail items was BIC, 1200 John Q Hammons Drive, Suite 501, Madison, WI.

51.     According to its website, Chrysalis identifies its office location as 111 E. Kilbourn, Suite 2800, Milwaukee, WI; however, a map embedded on the webpage above the 111 E. Kilbourn address identifies the office location as 207 E. Buffalo Street, Suite 604, Milwaukee WI, 53202.

52.     I reviewed records from BMO Harris Bank for business checking account 4810036405, the title and mailing address of which is Chrysalis Financial LLC, 3240 N Summit Avenue, Milwaukee, WI 53211. The signature card for this account lists Nohl and Graewin, and there are signatures on the signature lines above both names. After

27

reviewing the bank records for this account, I discovered numerous checks written from Chrysalis to the Marshall Building for Suite 604.

53.     A Chrysalis BMO Harris Bank cancelled check #5446, dated January 8, 2016, was written to "Marshall Bldg" for $1,800.00.  The check memo states the check is for "#604."  A Chrysalis BMO Harris Bank cancelled check #5553, dated May 5, 2016, was written to "Robert Marshall Bldg" for $600.00.  The check memo line for this check provided that it was for "Rent [ineligible] 604."  A Chrysalis BMO Harris Bank cancelled check #5555, dated May 16, 2016, was written to "Marshall Bldg" for $1,200.00.  The check memo states the check is for "Rent #604."  A Chrysalis BMO Harris Bank cancelled check #5572, dated August 15, 2016, was written to "Robert Marshall Bldg" for $1,800.00.  The check memo line for this check provided that it is for "Rent Ste 604."  A Chrysalis BMO Harris Bank cancelled check #5315, dated October 25, 2016, was written to "Marshall Bldg" for $600.00.  The check memo line provide that the check is for "Inv 618 Rent 604."

54.     On March 3, 2017, Special Agent David A. Klingbeil, Internal Revenue Service, conducted surveillance at 207 E Buffalo Street, Milwaukee, WI.  On the sixth floor, Special Agent Klingbeil observed a sign that listed eight names and their respective suite numbers.  Special Agent Klingbeil noted Chrysalis was identified in the list with the numbers "604" to the left of its name.  Special Agent Klingbeil located suite 604, and described the door as having a large glass window with the name "CHRYSALIS FINANCIAL" on it.  Special Agent Klingbeil also noted a white piece of paper attached to the glass window that read "UPS / FED EX PLEASE KNOCK ON SUITE 605."  Special

28

Agent Klingbeil also located suite 605, and described the door as a solid gray door that was metallic in appearance, possibly made of steel.

55.     During the SEC audit, BIC informed the SEC that the Fund's gems and minerals were held at the Chrysalis office in a walk-in vault. Several records obtained from Google in response to a search warrant for christopherjnohl@gmail.com reference a vault purchased by GP Rare Earth and installed at 207 E. Buffalo Street, Suite 605, Milwaukee, WI. Suite 605 is located in close proximity to Chrysalis' office in suite 604.

56.     A file named "GP RARE EARTH – RECEIPT – ULINE – VAULT SHELVING – 59685656 – JUN 23, 2014 412.pdf" is an invoice dated June 23, 2014 from ULINE, PO Box 88741, Chicago, IL. The invoice, number is 63540309, lists Chrysalis Arbitrage LLC, 3240 N Summit Avenue, Milwaukee, WI, as the "SOLD TO" entity, and GP Rare Earth Trading Account, 207 E Buffalo Street, Suite 605, Milwaukee, WI, as the "SHIP TO" entity. The items listed on the invoice include storage racks and shelves.

57.     I reviewed a file named "GP RARE EARTH – LEASE – MARSHALL BUILDING – VAULT STORAGE – 1 YEAR – OPT 3YR RENEW – MAY 1, 2014346.pdf" which is a signed lease for the Marshall Building, 207 East Buffalo Street, Suite 605, Milwaukee, WI. The lease is dated April 28, 2014 for suite 605 in the Marshall Building for a term of one year, beginning May 15, 2014 and ending on the last day of April 2015, with an amount of $1,630 due in rent each month. The lease also offers an option to extend the lease for an additional three years, beginning May 1, 2015 and ending on April 30, 2018. The lessee is identified as Christopher Nohl and the lessor is identified as Robert DeToro.

29

Signatures were provided for both signature lines above these two names.

58.    A file named "GP RARE EARTH – INVOICE – WISCONSIN SAFES –
WSQ20436 – MAY 15, 2014 374.pdf" is a quote dated May 15, 2014 from Wisconsin Safes,
N56W26872 Lisbon Road, Sussex, WI 53089, to customer GP Rare Earth, 207 E. Buffalo
Street, Milwaukee, WI 53202, for the purchase of item LMV – Class 1, a Custom
Lightweight Modular Vault – Class 1.  The shipping location is listed as the same address
as the customer address.  The quoted price is $115,000.  The document shows what
appears to be handwritten notes that claim the $50,000 down payment was paid on May
15, 2014 by check number 8277.  The document also includes plan views of what appears
to be the vault's installation, such as a plan view of the vault ceiling and a plan view of the
vault walls.

59.    I reviewed documentation received from US Bank regarding business
checking account 182376359432, the title and address of which is GP Rare Earth Trading
Account LLC, 3240 N. Summit Avenue, Milwaukee, WI.  A GP Rare Earth US Bank
cancelled check #8277, dated May 15, 2014, was written from GP Rare Earth to "Wisconsin
Safes" for $50,000.00.  The check memo line claims the check is for "Vault."  The check
amount and check number are identical to the amount and check number identified in the
apparently handwritten note.

60.    A file named "GP RARE EARTH – INVOICE – MARSHALL BUILDING –
OCT 7, 2014.pdf" is a document that provides details of current charges for suite number
605 of the Marshall Building, 207 E. Buffalo Street, Milwaukee, WI, (414) 276-5210.  The

30

total amount of the charges was $2,510, which includes $1,630 in rent for the current month, October 2014, and $880 for a prior balance from September.

61.     On March 8, 2017, I received insurance documents from Jewelers Mutual Insurance Company regarding GP Rare Earth. One of the documents included the current policy records for GP Rare Earth, effective between November 18, 2016 and November 18, 2017. The Named Insured is GP Rare Earth Trading, address 207 E. Buffalo Street, Ste. 605, Milwaukee, WI. The policy agreement states that the coverage applies to the described premises. Described Premises Location #1 is listed as 207 E. Buffalo Street, Ste. 605, Milwaukee, WI. In addition, the insurance application is included in the document, and claims a vault is located at 207 E. Buffalo Street, Suite 605, Milwaukee, WI. The Vault Application is also included in the document, and describes the vault as located at Location Number 1, which was identified in the application and policy as 207 E. Buffalo Street, Suite 605, Milwaukee, WI.

62.     I reviewed documentation received from US Bank regarding business checking account 182376359432, the title and address of which is GP Rare Earth Trading Account LLC, 3240 N. Summit Avenue, Milwaukee, WI. A GP Rare Earth US Bank cancelled check #8260, dated May 1, 2014, was written from GP Rare Earth to "The Marshall Building" for $1,630.00. The check memo line claims the check is for "Storage." A GP Rare Earth US Bank cancelled check #8281, dated May 30, 2014, was written from GP Rare Earth to "The Marshall Building" for $1,630.00. The check memo claims the check is for "Vault Lease Amt." Both of these check amounts are identical to the monthly rent

31

amount due for the lease of suite 605, as noted above.

63.     In 2015, GP Rare Earth appears to have moved its banking business to a business account with Summit Credit Union. I reviewed several documents obtained from Summit Credit Union for business account 0120264800, the name and address of which is GP Rare Earth Trading Account LLC, 207 E Buffalo Street, Suite 604, Milwaukee, WI. The Authorized Signer is listed as Nohl, 3240 N Summit Avenue, Milwaukee, WI. The check memos of several other checks imply GP Rare Earth continues to rent suite 605. A GP Rare Earth Summit Credit Union cancelled check #10785, dated August 12, 2016, was written from GP Rare Earth to "Robert Marshall Bldg" for $1,750.00. The check memo line claims the check is for "Suite 605." A GP Rare Earth Summit Credit Union cancelled check #10786, dated September 12, 2016, was written from GP Rare Earth to "Robert Marshall Bldg" for $1,750.00. The check memo line claims the check is for "Rent 605." A GP Rare Earth Summit Credit Union check #10800, dated what appears to be October 27, 2016, was written from GP Rare Earth to "Robert Marshall Bldg" for $1,750.00. The check memo claims the check is for "Ste 605."

### *Chrysalis and GP Rare Earth - 111 E. Kilbourn Avenue*

64.     According to the Wisconsin Department of Financial Institutions website, Chrysalis Holding, 111 E Kilbourn Avenue, Floor 28, Milwaukee, Wisconsin 53211, is the registered agent for Chrysalis. As previously identified, this address is also listed on Chrysalis' website as its office location.

65.     On March 8, 2017, Inspector Williams spoke with Letter Carrier S. Emanuele,

32

who was familiar with suite 2800 of 111 E. Kilbourn Avenue, Milwaukee, WI. Emanuele informed Inspector Williams that Suite 2800 has an office with the name Christopher Nohl posted on it. Emanuele also informed Inspector Williams that a company called Greenpoint moved in a year and a half ago. Inspector Williams displayed a picture of Michael Hull to Emanuele, and Emanuele looked familiar to him as one of the people he has seen in Suite 2800. Emanuele provided Inspector Williams a list of names that received mail in Suite 2800, which included Keller, Nohl, Chrysalis, and Greenpoint.

66.     In documents obtained from Google in response to a search warrant for christopherjnohl@gmail.com, I discovered two documents and an email that reference office space occupied by Chrysalis and GAM at 111 E. Kilbourn, Suite 2800, Milwaukee, WI.

67.     A file named "Alt Asset Signed Lease – Final.pdf" consists of a sublease agreement dated April 1, 2016 between Joe Sweeney, sub-landlord, and Alternative Asset Portfolio Services LLC (ALT), subtenant, for approximately 3,160 square feet of space in suite 2800 of the office building located at 111 E. Kilbourn Avenue, Milwaukee, WI. An internet search for this address identified the office building as the Milwaukee Center Office Tower. The sublease is for the term commencing on April 1, 2016, and expiring on April 1, 2019. On the signature page of the document, Sweeney is identified as the sub-landlord, ALT is identified as the subtenant, and Nohl is identified as ALT's co-president. Both signature lines above Sweeney and Nohl are signed. In addition to the sublease, the document includes Exhibit B, which depicts the floor plan of the Milwaukee Center's 28th

33

floor. The office space occupied by Chrysalis, ALT, and GAM are noted in the depiction. According to the depiction, Chrysalis occupies four spaces, approximately 514 square feet, and GAM occupies one space, approximately 124 square feet.

68.　　I also reviewed a file named "ALT - LEASE - 2800 KILBOURN AVE - FLOOR 28 - MILWAUKEE - WI - APR 2016 THRU APR 1 2019 161.pdf" which contained information materially consistent with the above-discussed sublease agreement.

69.　　I reviewed an email dated May 17, 2016 from Chadwick J. Keller, Chief of Banking Operations, Chrysalis Financial LLC, 207 E. Buffalo St., Suite 604, Milwaukee, WI, chadwickjkeller@chrysalisfinancial.com to colleen@joesweeney.com, christopherjnohl@gmail.com, and michael@greenpointfunds.com provided, "[a]ttached is the shared monthly rent and expense calculator for May for Suite 2800 . . . All payments are to be made to Pay It Forward Enterprises." The attachment, a document with a file name "Suite 2800 Monthly Rent & Expense Allocation.xlsx," is captioned at the top "SUITE 2800 MONTHLY RENT & EXPENSE ALLOCATION." According to this document, for the month of May 2016, Chrysalis owes $2,400.00, GAM owes $2,400.00, and ALT Asset Portfolio Svs owes $1,200.00. Each company was also charged for utilities. The document notes that checks are requested to be paid to Pay It Forward Enterprises, 111 East Kilbourn Ave. Suite 2800, Milwaukee, WI 53202.

### *Nohl's Residence - 3240 N Summit Ave*

70.　　My investigation has determined there is probable cause to believe Nohl and Graewin live together at 3240 N. Summit Avenue, Milwaukee, WI, use it as a business

34

location, and have received deliveries of gems, minerals, and stones through the interstate mail and deliveries at this location.

71.     According to the Property Search application accessible from the Assessor's Office section of the City of Milwaukee's website, city.milwaukee.gov, Shannon J. Graewin is the owner of 3240 N Summit Avenue, Milwaukee, WI.  As previously noted, Nohl identifies his address as 3240 N Summit Avenue, Milwaukee, WI, on the Summit Credit Union signature card for GP Rare Earth account 0120264800.  Nohl also identifies his address as 3240 N Summit Ave for the Fund's Summit Credit Union business account 120264900, effective April 16, 2015.

72.     According to the signature card for BMO Harris Bank Select Money Market account 4820370529, the title and mailing address of the account is Shannon J Graewin, Christopher J Nohl, 3240 N Summit Avenue, Milwaukee, WI.  Graewin and Nohl are the only individuals listed on the signature card, and the signature lines above both names have been signed.  The same is true for BMO Harris Bank Statement Savings account 3797442 and Portfolio Checking account 3797167.  As of November 22, 2016, these accounts remain open.

73.     According to records from WDFI, Chrysalis Holding's principle office is 3240 N. Summit Avenue, Milwaukee, WI.  The WDFI records reflect that, as updated on February 7, 2017, Graewin is the registered agent for Chrysalis Holdings and the address is her home.

74.     On March 3, 2017, Special Agent Klingbeil conducted surveillance of this

35

location and reported that it is a single-family residence. Agent Klingbeil reported to me that two vehicles were located at the residence on March 3, 2017 at 8:45 a.m. Special Agent Klingbeil observed a black Cadillac with Wisconsin license plate 308YGC, and a black Mercedes with Wisconsin license plate 243NKC. On March 8, 2017, I reviewed vehicle registration information obtained from NCIC regarding these two vehicles. According to the NCIC records, the vehicle with Wisconsin license plate 308YGC is registered to Chrysalis and Nohl, although the registration expired on January 22, 2017. In addition, the NCIC records show the registration address for this vehicle is 207 E Buffalo St #604, Milwaukee, WI. The NCIC records for the vehicle with Wisconsin license plate 243NKC show this vehicle is registered to Graewin, and the registration address is 3240 N Summit Avenue, Milwaukee, WI.

75. On March 7, 2017, at approximately 5:42 p.m., Inspector Williams conducted surveillance at 3240 N. Summit Avenue, Milwaukee, WI. Inspector Williams observed a black Mercedes Benz and a black Cadillac parked in the driveway of the address. Inspector Williams observed in the southwest corner of the home on the second floor what appeared to be an office. The lights were turned on in the room, and she observed a computer through the window of the room.

76. On March 9, 2017, Inspector Williams spoke with Letter Carrier J. Drost. Drost was very familiar with the address. Drost informed Inspector Williams that two people reside in the residence, Shannon and Christopher Nohl. Drost also stated the residence receives a lot of mail and a lot of packages from overseas. Drost estimated the

36

residence receives approximately ten to twelve packages per week. Inspector Williams displayed a photograph of Nohl to Drost, who identified the person in the photograph as Nohl.

77.     That same day, Inspector Williams identified several items of mail to be delivered to 3240 N Summit Avenue, Milwaukee, WI. These mail items were addressed to Nohl, Graewin, Chrysalis Financial II, Kai Squared Technologies, Chrysalis Financial III, Chrysalis Financial VI, and GP Petroleum. One of the packages was addressed to Graewin with a return address of GeoPeak Minerals, Karmin 4, 56-300 Milicz, Poland, www.geopeakminerals.com. Another package was addressed to Nohl with a return address of Dave Bunk Minerals, 5695 Yukon Street, Arvada, CO 80002.

78.     I reviewed a June 30, 2014 email that I received from Google between Nohl and Metropolis in which he asks Metropolis to mail original appraisals to his home address. I also reviewed many emails in which Nohl arranged to ship gems and other minerals to his address at 3240 N. Summit Street. One of those emails was received on February 29, 2016, confirming an order of "3000 Carat Lots of Chrysocolla & Turquoise Rough – Plus a FREE Facete Gemstone," which was shipped to this address. Another email, dated March 15, 2016 confirmed an order for "[o]utstanding- Chrome Tremolite Crrystal – Tanzania – 25 ct" and for "[a]sethetic Pryrite Crystal Stalactite – Huanzalla sm cabinet" both to be shipped to 3240 N. Summit Avenue. In a January 22, 2017 email with subject line "rough and cut questions," Nohl asks a vendor to "mail the rough to 3240 n summit avenue," and discusses pricing of gems and minerals.

37

79.     I reviewed a May 24, 2016 email that I received from Google between Nohl and a putative Chrysalis employee discussing insurance. In this email, the employee asks Nohl to confirm certain information needed for the insurance, including a reference to a Chrysalis-owned vehicle's parking location at 3240 N. Summit Avenue. Federal Agents have observed the Chrysalis-registered vehicle in the driveway frequently at Nohl's home at 3240 N. Summit Avenue, Milwaukee, WI. As such, this search warrant seeks permission to search this vehicle at the proposed search premises 3240 N. Summit Avenue, Milwaukee, WI and seize any of the items requested in Attachment F.

## SEIZURE OF THE GEMS, MINERALS, AND STONES AS EVIDENCE OF THE CRIME

80.     As discussed above and in Attachments B, D, and F, this application seeks to seize the Fund's gems, stones, and minerals found at the proposed search locations at 207 E. Buffalo Street, Suites 604-05, Milwaukee, WI, 111 E. Kilbourn Avenue, Suite 2800, Milwaukee, WI, and 3240 N. Summit Ave., Milwaukee, WI as evidence of the commission of the crimes. I submit that there is probable cause to believe that any gems, minerals, or stones at these locations are evidence of the scheme to defraud investors. The gems, stones, and minerals form the basis upon which inflated valuations were made and that the Hull brothers and Nohl have used to take inflated profits and management fees from investor contributions. As noted above, the FBI has retained an expert gemologist to analyze the gems, minerals, and stones to determine their authenticity, quality, and value. The authenticity, quality, and value of the gems, minerals, and stones will likely form a

38

central component of the evidence necessary to prove the crime of fraudulently overvaluing the Fund's assets.

81.     As noted above, I have spoken with Ms. Sandler, a gemologist, regarding the valuation of the gems, stones, and minerals. Ms. Sandler has advised me that it may require an extended period to analyze and determine the authenticity, quality, and value of these items. As such, I anticipated that the FBI will seize the Fund's gem, minerals, and stones for a period of time and to release them to the Fund on the condition that they not be sold, transferred, liquidated, or destroyed without prior notice to the FBI.

82.     Ms. Sandler has also advised me regarding proper methods to package for transport and store gems, minerals and stones. Ms. Sandler plans be present at the time of the seizure to provide further guidance. The gems, minerals, and stones seized at the proposed search locations will be documented and photographed by FBI Milwaukee's Evidence Response Team, will be properly packaged, and will be transported by the agents to a secured FBI facility located at the FBI Milwaukee field office, which is temperature controlled and has around-the-clock security.

83.     The FBI will retain custody of the gems, stones, and minerals while the experts analyze them for evidentiary purposes. The gems, minerals, and stones will be graded and evaluated using appropriate methods. The analysis conducted will be non-destructive in nature and will not reduce the value of the gems, minerals, and stones. If the government determines that destructive testing is necessary, it will seek authorization to conduct that testing from the United States District Court for the Western District of

39

Wisconsin, the district in which this investigation is proceeding. Ms. Sandler estimates that the analysis may be accomplished in approximately one month. The government does not know, however, the precise quality and quantity of gems, minerals, and stones that will be found on the proposed search locations. Should the government find an unexpected quality or quantity of gems, minerals, and stones, the analysis may require more time. The government anticipates that it will ask the FBI to return the gems, minerals, and stones in consultation with the Fund's attorneys and the United States District Court for the Western District of Wisconsin. The gems, minerals, and stones may be returned to the Fund on a rolling basis upon completion of the analysis. Should the Fund desire to retrieve a gem, mineral, or stone at a time prior to its return by the FBI, the Fund may make a written request properly identifying the item and provide the business purpose for its retrieval. At its discretion, the FBI will prioritize the analysis of that item and its return to the Fund.

**TECHNICAL TERMS**

84.     Based on my training and experience, I use the following technical terms to convey the following meanings:

      a.   "Cellular telephone" or "cell phone" means a hand held wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log,"

40

which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may include geolocation information indicating where the cell phone was at particular times.

b. "Computer," is defined in 18 U.S.C. § 1030(e)(1) as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

c. "Computer hardware," as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices such as, central processing units, internal and peripheral storage devices such as

41

fixed disks, external hard drives, and other memory storage devices;
peripheral input/output devices such as, keyboards, printers, video
display monitors, and related communications devices such as cables and
connections; and any devices, mechanisms, or parts that can be used to
restrict access to computer hardware such as, physical keys and locks.

d.  "Computer-related documentation," as used herein, consists of written,
recorded, printed, or electronically stored material which explains or
illustrates how to configure or use computer hardware, computer
software, or other related items.

e.  "Computer passwords and data security devices," as used herein, consist
of information or items designed to restrict access to or hide computer
software, documentation, or data.  Data security devices may consist of
hardware, software, or other programming code.  A password (a string of
alpha-numeric characters) usually operates a sort of digital key to
"unlock" particular data security devices.  Data security hardware may
include encryption devices, chips, and circuit boards.  Data security
software of digital code may include programming code that creates
"test" keys or "hot" keys, which perform certain pre-set security
functions when touched.  Data security software or code may also
encrypt, compress, or hide protected data to make it inaccessible or
unusable, as well as reverse the progress to restore it.

42

f.  The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form such as, writings or drawings; photographic form such as prints, negatives, videotapes, motion pictures, or photocopies; mechanical form such as printing or typing; or electrical, electronic or magnetic form such as tape recordings, cassettes, compact discs, hard drives, Personal Digital Assistants, Multi Media Cards, USB devices, smart cards, and memory calculators, as well as printouts or readouts from any magnetic, electrical or electronic storage device.

g.  "Hash Value" refers to the process of using a mathematical function, often called an algorithm, to generate a numerical identifier for data. A hash value can be thought of as a "digital fingerprint" for data. If the data is changed, even very slightly (like the addition or deletion of a comma or a period), the hash value changes. Therefore, if a file such as a digital photo is a hash value match to a known file, it means that the digital photo is an exact copy of the known file.

h.  "Electronic storage devices" includes computers, cellular telephones, tablets, and devices designed specifically to store electronic information (e.g., external hard drives and USB "thumb drives"). Many of these devices also permit users to communicate electronic information through

43

the internet or through the cellular telephone network (e.g., computers, cellular telephones, and tablet devices such as an iPad).

## ELECTRONIC STORAGE DEVICES AND FORENSIC ANALYSIS

85.     I have consulted in this matter with law enforcement officers with specialized knowledge and training in computers, networks, and Internet communications.  In particular, I have consulted with FBI Special Agent Neil Lee, who has received specialized training as a forensic computer, cellular telephone, and other electronic storage device examiner.  Special Agent Lee has been a forensic computer examiner with the FBI for approximately the last two years.  Special Agent Lee has participated in the execution of numerous search warrants and search and seizure operations.  Special Agent Lee has informed me that to properly retrieve and analyze electronically stored (computer) data, and to insure accuracy and completeness of such data and to prevent loss of the data either from accidental or programmed destruction, it is necessary to conduct a forensic examination of the electronic storage devices.  To effect such accuracy and completeness, it may also be necessary to analyze not only the electronic storage devices, but also peripheral devices which may be interdependent, the software to operate them, and related instruction manuals containing directions concerning operation of the device computer and software.

86.     As described above and in Attachments B, D, and F, this application seeks permission to search and seize records that might be found on the proposed search locations, in whatever form they are found.  One form in which the records might be

44

found is stored on a computer's hard drive, other storage media, within a hand-held electronic device such as a cellular telephone or a tablet device (e.g., an iPad device). Some of these electronic information, as explained below, might take a form that becomes meaningful only upon forensic analysis.

87.     I submit that if a computer or other electronic storage device is found on the proposed search locations, there is probable cause to believe those records will be stored in that electronic storage device, for at least the following reasons:

   a.   Based on my knowledge, training, and experience, I know that electronic storage device files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on an electronic storage device, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. It follows that deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, if the electronic storage device uses an operating system (in the case, for example, of a computer, cellular

45

telephone or tablet device) the device may also contain a record of deleted data in a "swap" or "recovery" file.

b.  Wholly apart from user-generated files, electronic storage device storage media—in particular, computers' internal hard drives—contain electronic evidence of how the device was used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation, and file system data structures.  Electronic storage device users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

c.  Files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

d.  Based on actual inspection of other evidence related to this investigation, spreadsheets, documents, financial records, invoices, I am aware that electronic storage device equipment was used to generate, store, and print documents used in the wire and mail fraud scheme.  Thus, there is reason to believe that there is an electronic storage device system currently located at the proposed search location.

46

88.     As further described in Attachments B, D, and F, this application seeks permission to locate not only electronic storage device files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how electronic storage devices were used, the purpose of their use, who used them, and when.

89.     Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processor, picture, and movie files), electronic storage device storage media can contain other forms of electronic evidence as described below:

a.  Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the electronic storage device was in use. Electronic storage device file systems can record information about the dates files were created and the sequence in which they were created.

b.  As explained herein, information stored within an electronic storage device and other electronic storage media may provide crucial evidence of the

47

"who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within an electronic storage device (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the electronic storage device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the electronic storage device was remotely accessed, thus inculpating or exculpating the electronic storage device owner. Further, electronic storage device activity can indicate how and when the electronic storage device was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the

48

crime under investigation.  Additionally, some information stored within an electronic storage device may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer or cellular telephone may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera).  The geographic and timeline information described herein may either inculpate or exculpate the electronic storage device user.  Last, information stored within an electronic storage device may provide relevant insight into the device user's state of mind as it relates to the offense under investigation.  For example, information within the electronic storage device may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the electronic storage device or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to

49

draw an accurate conclusion is a dynamic process. Whether data stored on an electronic storage device is relevant to the investigation may depend on other information stored on the electronic storage device and the application of knowledge about how an electronic storage device works. Therefore, contextual information necessary to understand the evidence described in Attachments B, D, and F also falls within the scope of the warrant.

    d. Further, in finding evidence of how an electronic storage device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, I know from training and experience that it is possible that malicious software can be installed on a computer, often without the computer user's knowledge, that can allow the computer to be used by others, sometimes without the knowledge of the computer owner.

90.     Based upon my knowledge, training and experience, I know that a thorough search for information stored in storage media often requires agents to seize most or all storage media to be searched later in a controlled environment. This is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. Additionally, to properly examine the storage media in a controlled environment, it is often necessary that some electronic storage device equipment, peripherals, instructions, and software be seized and examined in the controlled environment. This is true because of the following:

50

a. The nature of evidence. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how an electronic storage device has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.

b. The volume of evidence. Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

c. Technical requirements. Electronic storage devices can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of electronic storage device hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site. However, taking the storage media off-site and reviewing it in a controlled

51

environment will allow its examination with the proper tools and knowledge.

    d. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

91.    In light of these concerns, I hereby request the Court's permission to seize the electronic storage devices, associated storage media, and associated peripherals that are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site search of the hardware for the evidence described, if, upon arriving at the scene, the agents executing the search conclude that it would be impractical to search the hardware, media, or peripherals on-site for this evidence.

92.    In my training and experience, it is likely that the proposed search locations will contain at least one Apple brand device, such as an iPhone or iPad.

93.    In documents obtained from Google in response to a search warrant for christopherjnohl@gmail.com, I discovered several emails that suggest Nohl utilizes one or more iPhones for communication. An email dated May 27, 2016, subject "Fwd: Chrysalis Website Domain," from "Shannon's Gmail," sjgraewin@gmail.com, to christopherjnohl@gmail.com states "Sent from my iPhone" at the conclusion of the email. An email dated March 8, 2016, subject "Re: Follow-up email from SEC," from "Christopher J Nohl," christopherjnohl@gmail.com, to "Pam Kirchen," pamelakirchen@chrysalisfinancial.com, states, "[s]ent from my iPhone" at the conclusion

52

of the email. Two prior emails with the same date and subject from christopherjnohl@gmail.com to pamelakirchen@chrysalisfinancial.com conclude with the same "[s]ent from my iPhone" message. An email dated April 26, 2016, subject "[r]egards," from "Christopher J Nohl" to "Bryan Lees" states, "[s]ent from my iPhone" at the conclusion of the email. As shown in the emails here and above, "Christopher J. Nohl" has been associated with email address christopherjnohl@gmail.com.

94.     I know from my training and experience, as well as from information found in publicly available materials including those published by Apple, that some models of Apple devices such as iPhones and iPads offer their users the ability to unlock the device via the use of a fingerprint or thumbprint (collectively, "fingerprint") in lieu of a numeric or alphanumeric passcode or password. This feature is called Touch ID.

95.     If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) found at the bottom center of the front of the device. In my training and experience, users of Apple devices that offer Touch ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the

53

device.

96.    In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode or password must be used instead.  These circumstances include: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days.  Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time.  Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; and (3) five unsuccessful attempts to unlock the device via Touch ID are made.

97.    If Touch ID enabled Apple devices are found during a search of the premises, the passcode or password that would unlock such the devices are presently unknown to law enforcement.  Thus, it will likely be necessary to press the finger(s) of Nohl, who I believe to be an Apple device(s) user, to the device's Touch ID sensor in an attempt to unlock the device found during the search of the premises for the purpose of executing the search authorized by this warrant.  Attempting to unlock the relevant Apple device(s) via Touch ID with the use of the fingerprints of the user(s) is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

98.    In my training and experience, the person who is in possession of a device or

54

has the device among his or her belongings at the time the device is found is likely a user

of the device.  However, in my training and experience, that person may not be the only

user of the device whose fingerprints are among those that will unlock the device via

Touch ID, and it is also possible that the person in whose possession the device is found is

not actually a user of that device at all.  Furthermore, in my training and experience, I

know that in some cases it may not be possible to know with certainty who is the user of a

given device, such as if the device is found in a common area of a premises without any

identifying information on the exterior of the device.  Thus, it will likely be necessary for

law enforcement to have the ability to require Nohl, if at the proposed search locations, to

press his finger(s) against the Touch ID sensor of the locked Apple device(s) found during

the search of the premises in order to attempt to identify him as the device's user(s) and

unlock the device(s) via Touch ID.

### ONGOING BUSINESS FUNCTIONS

99.     I recognize that Christopher J. Nohl, Michael Hull, and Patrick Hull own or

control entities (the Companies) that are functioning companies potentially with several

employees at the proposed search locations, and that a seizure of the Companies'

electronic storage devices may have the unintended effect of limiting the Companies'

abilities to provide service to legitimate customers.  In response to these concerns, the

agents who execute the search anticipate taking an incremental approach to minimize the

inconvenience to the members' legitimate customers and to minimize the need to seize

equipment and data.  It is anticipated that, barring unexpected circumstances, this

55

incremental approach will proceed as follows:

    a.  Upon arriving at the search locations, the agents will attempt to identify a system administrator of the network (or other knowledgeable employee) who will be willing to assist law enforcement by identifying, copying, and printing out paper and electronic copies of the things described in the warrant. The assistance of such an employee might allow agents to place less of a burden on the Companies than would otherwise be necessary.

    b.  If the employees choose not to assist the agents, the agents decide that none are trustworthy, or for some other reason the agents cannot execute the warrant successfully without themselves examining the Companies' electronic storage devices, the agents will attempt to create an electronic "image" of those parts of the electronic storage device that are likely to store the things described in the warrant. Generally speaking, imaging is the taking of a complete electronic picture of the electronic storage device's data, including all hidden sectors and deleted files. Imaging an electronic storage device permits the agents to obtain an exact copy of the information stored within an electronic storage device without actually seizing the electronic storage device. The agents or qualified electronic storage device forensic experts will then conduct an off-site search for the things described in the warrant from the "mirror image" copy at a later date. If the agents successfully image the Companies' electronic storage devices, the agents will

56

not conduct any additional search or seizure of the Companies' electronic storage devices.

c.  If imaging proves impractical, or even impossible for technical reasons, then the agents will seize those components of the Companies' electronic storage device system that the agents believe must be seized to permit the agents to locate the things described in the warrant at an off-site location. The seized components will be removed from the search location. If employees of the Companies so request, the agents will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continuing function of the Companies' legitimate business. If, after inspecting the electronic storage devices, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it within a reasonable time.

## CONCLUSION

100.    I submit that this affidavit supports probable cause for a warrant to search

the premises described in Attachments A, C, and E, and to seize the items described in

Attachments B, D, and F.

Dated this ___20ᵗʰ___ day of March 2017.

Special Agent Allen J. Pettigrew
Federal Bureau of Investigation


Sworn to before me this ___20ᵗʰ___ day of March 2017.

David E. Jones
United States Magistrate Judge

58

## ATTACHMENT E

The property to be searched is 3240 N. Summit Avenue, Milwaukee, WI; it is a red brick, two-story, single-family residence that belongs to Shannon Graewin and at which Graewin resides with Christopher J. Nohl. The property includes a two-car garage and a driveway. Pictured in the driveway is a black Cadillac with a Wisconsin license plate of 308-YGC.



**ATTACHMENT F**

1.    All records relating to violations of the statutes listed on the warrant and involving Christopher J. Nohl, Michael Hull, and Patrick Hull since February 6, 2013, including:

   a.    Records containing any communications between or among Christopher J. Nohl, Michael Hull, Patrick Hull, Shannon Graewin, Pamela Kirchen, Chadwick Keller, Lauren Kelly, Ambika Sharma Dziak, William Metropolis, and James Zigras;

   b.    Records containing any communications, documents, or information related to Greenpoint Tactical Fund, LLC; Chrysalis Financial, LLC; Chrysalis Holding Company; GP Rare Earth, LLC; Bluepoint Investment Counsel, LLC; Greenpoint Asset Management, LLC; or Greenpoint Asset Management II, LLC;

   c.    Records containing any communications, documents, or information related to the purchase, sale, or storage of gems and minerals by, or for the benefit of, Greenpoint Tactical Fund, LLC; Chrysalis Financial, LLP; or GP Rare Earth, LLC; and

   d.    Records of communications, documents, or information related to the valuation of gems, minerals, or stones held by, or for the benefit of, Greenpoint Tactical Fund, LLC; Bluepoint Investment Counsel, LLC; Chrysalis Holding Company; Chrysalis Financial, LLP; Greenpoint Asset Management, LLC; Greenpoint Asset Management II, LLC; or GP Rare

Earth, LLC.

2.     All gems, minerals, or stones held by, or for the benefit of, Greenpoint Tactical Fund, LLC; Bluepoint Investment Counsel, LLC; Chrysalis Holding Company; Chrysalis Financial, LLP; Greenpoint Asset Management, LLC; Greenpoint Asset Management II, LLC; or GP Rare Earth, LLC.

3.     All of the above-described records and gems, minerals, or stones may be found in the vehicle found at the residence, a black Cadillac with a Wisconsin license plate of 308-YGC. The agents searching for such items have authority to search this vehicle.

4.     Any electronic storage devices or electronic media that were or may have been used as a means to commit the offenses described on the warrant, including mail or wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. During the execution of the search of the premises described in Attachment E, law enforcement personnel are authorized to press the fingers (including thumbs) of Christopher J. Nohl to the Touch ID sensor of the Apple brand device(s), such as an iPhone, found at the premises for the purpose of attempting to unlock the device via Touch ID in order to search the contents as authorized by this warrant.

5.     For any electronic storage device, computer hard drive, electronic device, cellular telephone, tablet or other physical object upon which electronic information can be recorded (hereinafter, "electronic storage device") that is called for by this warrant, or that might contain things otherwise called for by this warrant:

       a.     evidence of who used, owned, or controlled the electronic storage

2

device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.      evidence of software that would allow others to control the electronic storage device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.      evidence of the lack of such malicious software;

d.      evidence indicating how and when the electronic storage device was accessed or used to determine the chronological context of electronic storage device access, use, and events relating to crime under investigation;

e.      evidence indicating the electronic storage device user's location and state of mind as it relates to the crime under investigation;

f.      evidence of the attachment to the electronic storage device of other storage devices or similar containers for electronic evidence;

g.      evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the electronic storage device;

h.      evidence of the times the electronic storage device was used;

i.      passwords, encryption keys, and other access devices that may be

3

necessary to access the electronic storage device;

  j.  documentation and manuals that may be necessary to access the electronic storage device or to conduct a forensic examination of the electronic storage device; and

  k.  contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of electronic storage device or electronic storage; any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form.

4